IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CAROL PETERS,<br><br>            Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration;<br><br>            Defendant. | 4:12CV3233<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*

**PROCEDURAL HISTORY**

Plaintiff Carol Peters ("Plaintiff") filed an application for disability insurance benefits on April 21, 2010. (Tr. 43.) Plaintiff's claim was denied initially on June 1, 2010 (Tr. 43, 45-48), and on reconsideration on August 2, 2010 (Tr. 44, 50-53). A hearing was held before an Administrative Law Judge on July 20, 2011, and on August 10, 2011. (Tr. 13-18.) Following the hearing, the ALJ found that Plaintiff was not "disabled" as defined in the Act. (Tr. 13-18, 24, 43-44.) Specifically, the ALJ found that Plaintiff failed to meet her burden and Plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 15-16.) The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform unskilled, light work, which did not preclude either her performance of her past work as a motel maid, or the performance of a full range of

unskilled light work, including the representative occupations of laundry work and cafeteria attendant. (Tr. 17.)

Plaintiff appealed the ALJ's decision to the Appeals Council on August 28, 2011, and submitted additional evidence for the Appeals Council to consider. (Tr. 1-2, 8.) On September 26, 2012, the Appeals Council, having reviewed the additional evidence submitted by Plaintiff regarding her disability claim, found no basis for changing the ALJ's decision and denied Plaintiff's request for review. (Tr. 1-5.)

## FACTUAL BACKGROUND

In Plaintiff's application for DIB, she stated that she was born in 1956, and alleged that she became disabled beginning April 1, 2007. (Tr. 95.) Plaintiff's insured status under Title II of the Act expired on December 31, 2009. (Tr. 15, 111.) In her Disability Report, she alleged disability due to a "bad back." (Tr. 115.)

A. **Testimony at the Administrative Hearing**

At the administrative hearing on July 20, 2011, Plaintiff's attorney confirmed that Plaintiff had not returned any of the paperwork sent by the agency, including the interrogatories, list of medications, and work history, and Plaintiff was given leave to submit the documents. (Tr. 22, 25.) The attorney confirmed that Plaintiff had not received any medical treatment and that her only medication was over-the-counter ibuprofen. (Tr. 25-26.) Plaintiff's attorney claimed that Plaintiff could not return to her past work because of cognitive difficulties and neurological deterioration that was present in her family history. (Tr. 26.) He suggested that the ALJ could observe her testimony and determine her functioning and whether a consultative examination was warranted. (Tr. 26.)

Plaintiff testified at her administrative hearing that she had received her high school diploma, was of average intelligence, could read and write, and could read a newspaper or magazine. (Tr. 27-28.) Plaintiff had been married for 34 years. (Tr. 28.) Plaintiff had a driver's license, but had stopped driving two years earlier because her husband was concerned about the way she backed out of the driveway. (Tr. 29-30.) Plaintiff worked as a motel maid for most of her work history, and spent a short time cleaning houses for people with special needs. (Tr. 28-29.) Plaintiff testified that she "decided to retire" after she was hurt at work and because her husband received his retirement settlement. (Tr. 30.) She then clarified that she decided to quit work because she could not clean rooms fast enough. (Tr. 31.)

In describing her daily activities, Plaintiff stated she cared for a dog, a cat, and a parrot. (Tr. 31.) She testified that she cleaned all of her house once a day and did laundry. (Tr. 31-32.) Her interests and hobbies included watching television, camping, fishing, and attending weekly car races. (Tr. 32-34.) She handled her own money, had a checkbook, and paid the bills. (Tr. 38.) Plaintiff did the grocery shopping. (Tr. 38.) Because she did not drive, Plaintiff's husband was with her when she left the house and either her husband or son was with her at home. (Tr. 38-39.)

Plaintiff told the ALJ that she had applied for disability because her husband told her she had a bad back. (Tr. 35.) Plaintiff explained that she was burned two years earlier when she used a heating pad without a cover. (Tr. 35-36.) She did not receive any treatment for the burn because she did not like doctors. (Tr. 36.) Plaintiff did not show the ALJ the scar because it was on her lower back. (Tr. 37.) Plaintiff testified that the scar did not give her any problems, and then stated that she had pain in her back

3

since she fell on the ice in high school. (Tr. 37.) She did not think she could be "fast enough" to go back to motel work. (Tr. 37.)

Steven Kuhn, a vocational expert, testified in response to a hypothetical question posed by the ALJ. (Tr. 39-40.) The hypothetical individual was the same age as Plaintiff and had the same education and work experience. (Tr. 40.) The ALJ first asked the vocational expert to assume the questions related to an individual who could lift or carry 50 pounds occasionally and 25 pounds frequently and had no limitation on the ability to stand, sit, or walk. (Tr. 40.) The vocational expert testified that such an individual could return to Plaintiff's past work as a motel cleaner. (Tr. 40.) If the individual were restricted to work with light exertion, i.e., lifting and carrying 20 pounds occasionally and 10 pounds frequently, the individual could still perform the motel cleaner job. (Tr. 40.) The vocational expert testified that such an individual could perform other unskilled, light work, including the representative positions of laundry worker and cafeteria attendant. (Tr. 40-41.)

**B.    New Evidence Submitted to the Appeals Council**

Although Plaintiff did not submit any medical evidence to the ALJ, Plaintiff submitted medical records to the Appeals Council following the ALJ's denial of her claim. (Tr. 4-5, 172-298.) Plaintiff also submitted third-party statements from friends, Stephen Mason and Janice Temple, in February 2012. (Tr. 4, 156-59.)

Two days after the administrative hearing, on July 22, 2011, Plaintiff began to receive care from Steven Saathoff, M.D., at Falbrook Family Health Center, and asked to be tested for Huntington's disease. (Tr. 184.)  Plaintiff had a family history of Huntington's disease in her mother, brother, niece, and six out of ten maternal aunts

4

and uncles. (Tr. 185.) Plaintiff had not had any laboratory testing performed on her blood since giving birth to her youngest child 30 years earlier (Tr. 28, 184), but she wanted to be tested because she was exhibiting "spasmodic jerking" of her extremities." (Tr. 184). Her physical examination revealed that she exhibited involuntary movement of all extremities consistent with Huntington's chorea. (Tr. 186.) Plaintiff tried to cover the involuntary movements by crossing her legs and arms, keeping them close to her body to prevent them from moving. (Tr. 186.) She was observed to have difficulty getting on and off the examination table because of her gait instability. (Tr. 186.) Her gait revealed involuntary limb movement disorder. (Tr. 186.) Plaintiff did not want to try any medications and specifically requested that only laboratory work be performed. (Tr. 186.) Dr. Saathoff's only treatment recommendation was that Plaintiff have an annual physical examination. (Tr. 186.)

The next month, Plaintiff met with the doctor to discuss her laboratory results. (Tr. 182.) The DNA test from Athena Diagnostics indicated that Plaintiff possessed the Huntington's disease DNA mutation and was "predicted to be affected with or predisposed to developing the clinical symptoms associated with Huntington's disease." (Tr. 173.) Plaintiff's blood work was otherwise normal. (Tr. 176-77, 182.) During the visit, Plaintiff's husband told the doctor that Plaintiff had been exhibiting symptoms for more than five years but stubbornly refused to seek medical treatment. (Tr. 182.) Plaintiff agreed to a neurology consult but did not want to try any medication. (Tr. 183.) Her main concern was telling her three children about the diagnosis. (Tr. 182.) Her physical examination was unchanged from her previous visit. (Tr. 183.)

5

At the end of August 2011, Plaintiff met with John Puente, M.D., to discuss her Huntington's disease diagnosis and treatment of any symptoms. (Tr. 207.) Plaintiff's mother and brother both died from Huntington's disease, her mother at the age of 60. (Tr. 209.) A review of systems indicated Plaintiff had some difficulty with balance and paralysis. (Tr. 207.) On physical examination, Dr. Puente observed her moving both hands and her head "a bit" in chorea type movements. (Tr. 207.) She had some unsteadiness in her gait due to the abnormal movement. (Tr. 207.) Dr. Puente characterized her gait as "altered, but not clearly ataxic." (Tr. 207.) Dr. Puente started Plaintiff on enzymes to better control her chorea movement. (Tr. 207.)

In January 2012, Dr. Puente completed a physical RFC assessment. (Tr. 222-28.) Based on her diagnosis of Huntington's disease, Dr. Puente opined that Plaintiff could lift and carry less than 10 pounds occasionally, sit for less than 6 hours, stand and walk for less than 2 hours, and never perform any postural maneuvers during an 8-hour work day because of her gait unsteadiness and poorly controlled gross movement. (Tr. 223-24.) She was limited in reaching, handling, fingering, and feeling. (Tr. 225.) Dr. Puente stated that Huntington's disease was a progressive, deteriorating, irreversible neurological condition with accompanying cognitive decline. (Tr. 223.) He also noted that Huntington's disease was a terminal condition. (Tr. 223.) It was not compatible with working in later stages. (Tr. 227.)

In May 2012, Plaintiff went to the emergency room after a fall and was admitted to the hospital for five days. (Tr. 238.) Her ability to walk had declined during the past month and she had not been walking for the past several days. (Tr. 248.) The doctor performed brain surgery to remove a blood clot. (Tr. 248.) A treatment note indicates

that Plaintiff's Huntington chorea had been "problematic for many years, but [Plaintiff] avoided diagnosis till one year ago." (Tr. 244.)

On June 4, 2012, Dr. Puente responded to Plaintiff's attorney's request for an onset date of Plaintiff's functional limitations. (Tr. 289.) Dr. Puente stated that his "best guess" would be 2006, based on her husband's statement to Dr. Saathoff in her 2011 medical records that Plaintiff had been exhibiting symptoms for more than five years. (Tr. 182, 289.) Dr. Puente stated that Plaintiff had involuntary movements in both arms and legs that caused gait instability and difficulty with even gross movements such as sitting. (Tr. 289.) He stated that this had been present for years "starting in at least 2006." (Tr. 289.) Plaintiff followed-up with Dr. Puente on June 26, 2012. (Tr. 293.) He stated that Plaintiff's symptoms had "calmed down." (Tr. 293.) She still had trouble getting around, but the movement seemed to be adequately suppressed. (Tr. 293.) Her walk was quite dystonic and she was reliant on her walker. (Tr. 293.)

On February 10, 2012, Plaintiff sent letters to the Appeals Council from two personal friends, Steven Mason and Janice Temple. (Tr. 156, 158.) Mr. Mason stated that he has known Ms. Peters for 15 years. (Tr. 157.) He stated that Plaintiff had previously worked as a motel housekeeper and had been very self-sufficient. (Tr. 157.) However, Mr. Mason began to notice a gradual deterioration in Plaintiff's health. (Tr. 157.) At first she exhibited problems with her gait and exaggerated arm movements and her speech became halted. (Tr. 157.) By 2002 or 2003 she was unable to function in her position due to increased difficulty in walking and controlling her arm movements and retired early. (Tr. 157.) In early 2009 she stopped driving due to fears that it was no longer safe. (Tr. 157.) Ms. Temple's letter similarly noted Plaintiff's problems with falling

7

due to gait problems as well as her inability to cook because of fear that she would stumble and start a fire. (Tr. 159.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues de novo. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Frederickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004).

## DISCUSSION

**1.   ALJ's Refusal to Order a Consultative Examination**

Plaintiff first argues that the ALJ failed to develop the record when he did not order a consultative examination after the hearing and after Plaintiff's husband completed a Supplemental Information Form, dated May 10, 2010. For any claim decision, the plaintiff bears the burden of establishing that she had a severe impairment, and the plaintiff bears the responsibility of furnishing medical evidence to show that she

8

is disabled. *See* 20 C.F.R. § 404.1512. Nevertheless, "The ALJ has a duty to fully and fairly develop the evidentiary record." *Byes v. Astrue*, 687 F.3d 913, 915-16 (8th Cir. 2012). A consultative medical examination is required to fully develop the administrative record when the evidence as a whole is not sufficient to support a claim decision. *See* 20 C.F.R. § 404.1519a(b). The regulations explain that a consultative medical evaluation is necessary where the claimant's medical sources cannot provide sufficient evidence about the impairment. 20 C.F.R. § 416.917.

The ALJ's decision is not reversible for failing to order a consultative examination. Plaintiff argues that "[h]ad the record been properly developed, the medical evidence would have established that [Plaintiff] was and had been suffering from Huntington's Disease from at least 2006." (Pl. Br., Filing No. 12, at 7.) It is presumed that the Plaintiff takes this position because a consultative examination may have mirrored the opinions stated in Plaintiff's additional evidence submitted the Appeals Council. Plaintiff does not argue that her medical sources failed to provide sufficient evidence of her impairment. Thus, a consultative examination would have been merely duplicative of the evidence already before the Appeals Council. Such duplication is unnecessary. Accordingly, the ALJ did not err by refusing to order a consultative examination.

**2.    The New Evidence Does Not Warrant Reversal or Remand**

Even considering the new evidence Plaintiff submitted to the Appeals Council, the ALJ's decision is supported by substantial evidence. In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security

9

Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on

to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); *see also Bowen*, 482 U.S. at 140–41 (explaining five-step process).

Plaintiff argues that the ALJ erred in terminating the analysis at step 2, by concluding that Plaintiff had no severe impairment through the date she was last insured. (Tr. 15.) In support of her argument, Plaintiff states that Dr. Puente confirmed that she had Huntington's Chorea, which meets the listing under 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.17. Section 11.17 covers "Degenerative disease not listed elsewhere, such as Huntington's chorea, Friedreich 's ataxia, and spino-cerebellar degeneration. With: A. Disorganization of motor function as described in 11.048; . . . ." Section 11.04 B requires "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."   The record demonstrates that Plaintiff did not submit any medical records to the ALJ, and testified at the administrative hearing that she could not work because of a bad back. (Tr. 24, 25-26, 35-37.) Plaintiff was tested for Huntington's Disease two days after the hearing. (Tr. 184.) Medical records concerning Plaintiff's treatment for Huntington's Disease were developed over the next year. (Tr. 184-298.) These records were before the Appeals Council when it denied review of the

ALJ's decision. (Tr. 1.) Further, the Appeals Council's decision makes it clear that it considered this new evidence and found that the additional records did not provide a basis for changing the ALJ's decision. (Tr. 1-5.) The Court agrees that, even considering the additional evidence, substantial evidence supports the ALJ's decision.

Plaintiff has the burden of establishing the existence of a disability on or before the expiration of her insured status. *Basinger v. Heckler,* 725 F.2d 1166, 1169 (8th Cir. 1984). Under Eighth Circuit law, "medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status." *Id.* (citations omitted). However, a nondisabling condition which later develops into a disabling condition after the expiration of a claimant's insured status cannot be the basis for an award of disability benefits under Title II. *Thomas v. Sullivan,* 928 F.2d 255, 260–61 (8th Cir.1991); *Dunlap v. Harris,* 649 F.2d 637, 638 (8th Cir.1981). Accordingly, Plaintiff bears the burden of establishing the existence of her disability prior to December 31, 2007, the date her insured status expired. (*See* Pl. Br., Filing No. 12 at 11.)

Plaintiff's declining condition subsequent to the administrative hearing, while relevant, does not necessarily establish that she was disabled on the date her insured status expired. Dr. Puente described Huntington's disease as a progressive, deteriorating, irreversible neurological condition with accompanying cognitive decline. (Tr. 223.) Medical records from the year following Plaintiff's test for Huntington's show a rapid decline in Plaintiff's motor function. (Tr. 184-298.) Her physicians' treatment notes describe involuntary movements in her arms, legs, and head (Tr. 185-86, 289.)

Although her gait was not clearly ataxic in late 2011 (Tr. 207), by June 2012 her gait was "quite dystonic" and she was reliant on her walker (Tr. 293). However, Plaintiff's subsequent diagnosis and degeneration does not automatically result in a retroactive assignment of limitations to the Plaintiff prior to the ALJ's decision. Instead, the Court must evaluate whether the ALJ's decision remains supported by substantial evidence for the relevant time period.

The Court concludes that even considering the additional evidence, the ALJ's decision is supported by substantial evidence. At the administrative hearing, Plaintiff testified about her daily activities. These activities included cleaning the entire house every day, doing laundry, spending several hours sitting and watching television, camping, fishing, and attending weekly car races. (Tr. 31-32, 33-34, 35.) Plaintiff also testified that she handled her own money, had a checkbook, and paid the bills. (Tr. 38.) Plaintiff's ability to perform these activities prior to the hearing supports a finding that her symptoms were not sufficiently severe. The ALJ was also permitted to discount Plaintiff's subjective complaints of pain because she failed to seek medical advice prior to filing for SSI. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) ("An ALJ may discount a claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment."). For the same reasons, the ALJ was permitted to discount the credibility of the third-party statements of Mr. Mason and Ms. Temple.

At the administrative hearing, a vocational expert testified that a hypothetical individual with Plaintiff's abilities at the time of the hearing could return to Plaintiff's past work as a motel cleaner. (Tr. 40.) The expert testified that when restricted to work requiring light exertion, i.e., lifting and carrying 20 pounds occasionally and 10 pounds

frequently, the individual could still perform the motel cleaner job. (Tr. 40.) The vocational expert added that such an individual could perform other unskilled, light work, including the representative positions of laundry worker and cafeteria attendant. (Tr. 40-41.) The testimony of the vocational expert at the hearing supports the ALJ's decision.

The additional evidence Plaintiff submitted to the Appeals Council does not establish that, as of the date last insured, she suffered "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.17. On July 22, 2011, Dr. Saathoff noted that Plaintiff tested positive for Huntington's DNA. (Tr. 182.) He also noted that her husband stated that Plaintiff had been exhibiting symptoms for over five years, but refused to come to the doctor for treatment. (Tr. 182.) Dr. Puente provided his "best guess" about Plaintiff's retroactive functional limitations by referencing Dr. Saathoff's notes about her symptoms. (Tr. 289.) Thus, Dr. Puente's guess was based on Dr. Saathoff's notes, and Dr. Saathoff's notes were based on Plaintiff's husband's statements. The Appeals Council was permitted to discount this evidence of retroactivity because it was not based on medically acceptable clinical and laboratory diagnostic techniques, and was inconsistent with other substantial evidence in the record. Social Security Ruling (SSR) 96-2p; *see also Goff v. Barnhart,* 421 F.3d 785, 790-91 (8th Cir. 2005) (stating that "an appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion."). The decision of the ALJ, and ultimately the Appeals Council, is supported by the inconsistency between the statements of the husband and Plaintiff's activities.

**CONCLUSION**

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed. Accordingly,

IT IS ORDERED:

1. The Commissioner's decision is affirmed;

2. The appeal is denied; and

3. Judgment in favor of the Defendant will be entered in a separate document.

Dated this 3rd day of January, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge